IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

JUAN CARLOS RUIZ,

          Petitioner,

  vs.

RICHARD J. KIRKLAND,

          Respondent.

No. C 05-01636 WHA (PR)

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS**

## INTRODUCTION

This is a habeas case filed pro se by a state prisoner pursuant to 28 U.S.C. 2254. Respondent was ordered to show cause why the writ should not be granted based on the claim set forth in the petition. Respondent has filed an answer and a memorandum of points and authorities in support of it. Petitioner has responded with a traverse. For the reasons set forth below, the petition is **DENIED**.

## STATEMENT

In 2001, petitioner was convicted in San Mateo County Superior Court of first-degree murder pursuant to California Penal Code § 187 (Exh. B at 1638-42).[1] Petitioner was acquitted on the lesser-included offense of dissuading a witness without force or threat, Cal. Pen. Code § 136.1(c)(1) (Exh. E at 2). The jury found true the allegation that petitioner committed the murder for the benefit of a street gang, but found not true the allegation that petitioner

---

[1] Unless otherwise specified, citations to "Exh." are to the exhibits lodged with respondent's answer.

1  committed the murder by means of torture (*id.* at 3). The jury also found not true the allegation

2  that during the commission of the murder petitioner personally used a screwdriver as a deadly

3  weapon pursuant to California Penal Code § 12022(b)(1) (Exh. E at 3). The jury could not

4  agree on the allegation that petitioner personally used a knife, and this allegation was

5  subsequently stricken (*ibid.*). On January 11, 2002, the trial court sentenced petitioner to a term

6  of twenty-five years to life on the first-degree murder conviction, plus a consecutive term of

7  three years on the gang allegation (*id.* at 2-3).

8        Petitioner was tried with a co-defendant, Randy Reyes. Reyes was found guilty of

9  second-degree murder and dissuading a witness with force or threat, and was sentenced to

10 fifteen years to life for the murder conviction, plus a consecutive term of two years for

11 dissuading a witness with force or threat (*ibid.*). Another co-defendant, Edgar Hernandez,

12 entered into a plea agreement in which he agreed to testify against petitioner and Reyes and to

13 plead guilty to assault with a deadly weapon and related enhancements in exchange for a

14 sentence of time served plus 364 days (Exh. B. at 1218-19).

15       Petitioner appealed the judgment against him, claiming that there existed no substantial

16 evidence to establish the premeditation and deliberation necessary for his first-degree murder

17 conviction, and that the trial court made numerous instructional and sentencing errors (Exh. E at

18 6). On April 19, 2004, the California Court of Appeal struck the three-year sentence

19 enhancement based on the special gang allegation, but affirmed the judgment in all other

20 respects (*id.* at 29). The California Supreme Court denied a petition for review on July 21, 2004

21 (Exh. F), and petitioner filed the present federal habeas petition on April 19, 2005.

22       The following background facts describing the crime are taken from the opinion of the

23 California Court of Appeal:

24       On January 8, 1999, Inspector Daniel Hance was sent to the scene of a
   shooting in San Francisco. The victim of the shooting was a member of a
25 Surenos Street gang and witnesses stated that members of the Nortenos had done
   the shooting. Hance subsequently interviewed William Tejada, who was to
26 become the victim in this case, after Tejada had been detained by police in the
   car used in the drive-by shooting. Tejada told Hance that Manuel LaFontaine did
27 the shooting as Tejada was driving the car. Tejada also told Hance that while he
   "hung with" a Nortenos gang called the Daly City Locos (DCL), he was not a
28 formal member of the gang but LaFontaine was a member.

2

Hance testified that the concept of respect is very important in gang life and that "snitching" is a violation of the first commandment of gang life. In Hance's experience, members who snitch to the police are subject to "severe aggravated" assault and even death in retaliation. When Hance dropped Tejada at his home after taking his statement, he explained that after LaFontaine was arrested his attorney would have access to police reports and see that Tejada had made a statement to the police. Tejada seemed "somewhat concerned, but he didn't seem overly concerned" about his personal safety. Tejada indicated that he would try to "get in some sports program or athletic program at school and stay away from the people that he was hanging around with."

Tejada's mother testified that a couple of months later when she was out with Tejada, her son became nervous when he saw some Hispanic men in a car making signs with their hands simulating a gun. One of the men was LaFontaine's brother and another was the brother's friend. Tejada told his mother that he was afraid he might be retaliated against for having talked to the police about the January shooting.

On the afternoon of April 23, 1999, Tejada went to a party at the M.P. Brown School in Daly City. When he arrived, approximately 20 people already were there. Edgar Hernandez and Alex Obregon, both DCL members, were there. At some point, Obregon and a few others went to get some food at McDonald's. On their way back they were flagged down and got into a car with Ruiz and Reyes. Someone asked, "What are we going to do about [Tejada]?" Ruiz replied, "Don't worry about it. We'll handle it tonight." Obregon thought this meant Tejada would be "jumped out" of the gang, meaning he would be beaten up, but he was not overly concerned because DCL members did not use weapons on other DCL members.

When they returned, Obregon told Tejada that "they're plotting on you, you know" and to "watch your back." Tejada, however, did not believe his friends would hurt him. Meanwhile, defendants were in a group with other DCL members, including Hernandez, talking about Tejada. Hernandez testified that Ruiz said that "something should be done about him." Someone said Tejada "should get jumped out" of the DCL and Hernandez agreed. Ruiz, however, "said something like ... he wasn't going to buy that plan." Hernandez suggested that another individual, who wanted to join the DCL, challenge Tejada to a one-on-one fight in order to jump himself into the gang and jump Tejada out. Hernandez left the group after making the suggestion and did not know whether the others adopted his plan.

About 10:30 p.m., people started leaving the school grounds. Hernandez and a number of other gang members were walking down the pathway out of the school when Hernandez saw Ruiz grab Tejada by the neck and take him to the ground. Four others, including Reyes, began hitting and kicking Tejada. He saw Reyes crouching down and thought he might be holding Tejada's legs. Although Hernandez denied seeing any weapons, he admitted that he had previously told the police that he saw Ruiz using a knife. He explained that when he initially talked to the police he thought he had seen a knife, but in fact he had not. Hernandez joined in the attack and kicked Tejada twice in the legs, but he left before the attack was over.

Obregon testified that as he and Tejada were leaving the school, Ruiz grabbed Tejada and took him to the ground. The others began kicking and

3

punching Tejada while Reyes was holding his legs. Obregon testified that after watching the attack for a short while, he was chased away by Reyes and other members of the gang. Obregon was impeached during cross-examination with prior inconsistent statements he made to the police and with the acknowledgment that he had lied at the preliminary hearing. Obregon admitted that he had testified at the preliminary hearing that it was too dark to see any faces and he could not remember who surrounded Tejada at the time of the attack.

Nester Silva, who was with Hernandez, testified that he watched the attack for a few minutes before heading to Hernandez's car, and that he saw a sharp object that "looked like blade" dropped by or near Ruiz. When he met Hernandez at his car, Hernandez said he had not expected the assault to go so far and that he had not known that Tejada would be "shanked." On cross-examination Silva acknowledged that it was dark at the time of the attack and he could not see who was kicking Tejada.

On the morning of April 24, 1999, Tejada's dead body was found on the path near the school. His body had many injuries, including abrasions, contusions, and numerous stab wounds. Some of the stab wounds had been inflicted with a knife and some possibly with a screwdriver. Approximately 44 were to the neck and head, including Tejada's eyes. The immediate cause of his death was venous air embolism, caused by two wounds to his jugular vein. Other concurrent blunt, sharp, and penetrating injuries also contributed to Tejada's death.

When the police first interviewed Ruiz on April 27, he told them that Reyes had picked him up that evening about 9:00 p.m. and drove around various parts of San Francisco and the Peninsula looking to pick up girls. Reyes told police the same story when he was interviewed later that day. Reyes's sister testified at trial on his behalf, stating that Reyes was a full-time college student and that she would be surprised to learn that her brother was in a gang. Three other former gang members testified that Reyes was not a gang member and Ruiz had begun distancing himself from the gang after he found out his girlfriend was pregnant.

(Exh. E at 3-5).

## ANALYSIS

**A.     STANDARD OF REVIEW**

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. 2254(d).  The first prong applies both to questions of law and to mixed questions of law

and fact, *Williams (Terry) v. Taylor*, 529 U.S. 362, 407-09 (2000), while the second prong applies to decisions based on factual determinations, *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

A state court decision is "contrary to" Supreme Court authority, that is, falls under the first clause of 2254(d)(1), only if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams (Terry)*, 529 U.S. at 412-13.  A state court decision is an "unreasonable application of" Supreme Court authority, falls under the second clause of 2254(d)(1), if it correctly identifies the governing legal principle from the Supreme Court's decisions but "unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413.  The federal court on habeas review may not issue the writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411.  Rather, the application must be "objectively unreasonable" to support granting the writ. *See id.* at 409.

"Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary." *Miller-El*, 537 U.S. at 340.  This presumption is not altered by the fact that the finding was made by a state court of appeals, rather than by a state trial court. *Sumner v. Mata*, 449 U.S. 539, 546-47 (1981); *Bragg v. Galaza*, 242 F.3d 1082, 1087 (9th Cir.), amended, 253 F.3d 1150 (9th Cir. 2001).  A petitioner must present clear and convincing evidence to overcome Section 2254(e)(1)'s presumption of correctness; conclusory assertions will not do. *Ibid.*

Under 28 U.S.C. § 2254(d)(2), a state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El*, 537 U.S. at 340; *see also Torres v. Prunty*, 223 F.3d 1103, 1107 (9th Cir. 2000).

When there is no reasoned opinion from the highest state court to consider the petitioner's claims, the court looks to the last reasoned opinion, which in this case is that of the

California Court of Appeal. *See Ylst v. Nunnemaker*, 501 U.S. 797, 801-06 (1991); *Shackleford v. Hubbard*, 234 F.3d 1072, 1079, n. 2 (9th Cir.2000).

**B.     ISSUES PRESENTED**

As grounds for federal habeas relief, petitioner claims: (1) there was insufficient evidence of premeditation and deliberation to support the first degree murder verdict;(2) his due process rights were violated by the trial court's refusal to instruct on voluntary manslaughter; (3) his right to have the jury instructed on his theory of defense was violated by the trial court's refusal to give lesser related offense instructions; and (4) the instructions on aiding and abetting and the natural and probable consequences doctrine violated his due process rights.

**1.     INSUFFICIENCY OF EVIDENCE**

Petitioner claims that there is insufficient evidence of premeditation and deliberation to support the verdict of first-degree murder.  In collaterally reviewing a claim that there is insufficient evidence supporting a prisoner's state court conviction, the federal court must determine whether "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319.  Only if no rational trier of fact could have found proof of guilt beyond a reasonable doubt, may a writ be granted. *Id.* at 324. Under AEDPA, the federal habeas court must ask whether the operative state court decision reflected an unreasonable application of *Jackson* to the facts of the case. *Juan H. v. Allen*, 408 F.3d 1262, 1275 (9th Cir. 2005)  (quoting 28 U.S.C. § 2254(d)).

The California Court of Appeal rejected petitioner's challenge to the sufficiency of the evidence of premeditation and deliberation supporting his first-degree murder conviction and the California Supreme Court denied a petition for review (Exh. E at 9; Exh. F).  The California Court of Appeal rejected petitioner's claim based on the following reasoning:

> Ruiz contends that there is no substantial evidence of premeditation and deliberation. "When considering the claim of a criminal defendant that a verdict was not supported by sufficient evidence, 'the court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence-that is, evidence which is reasonable, credible, and of solid value-such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' " ( *People v. Hawkins* (1995) 10 Cal.4th 920, 955,

6

overruled on different grounds in *People v. Blakeley* (2000) 23 Cal.4th 82, 89 .)

In *People v. Anderson* (1968) 70 Cal.2d 15, 25-26, the California Supreme Court clarified the difference between first and second degree murder and the bases upon which a reviewing court may find the evidence sufficient to support a verdict of first degree murder. The court stated, "we find no indication that the Legislature intended to give the words 'deliberate' and 'premeditated' other than their ordinary dictionary meanings. Moreover, we have repeatedly pointed out that the legislative classification of murder into two degrees would be meaningless if 'deliberation' and 'premeditation' were construed as requiring no more reflection than may be involved in the mere formation of a specific intent to kill. [Citations.] [¶] Thus we have held that in order for a killing with malice aforethought to be first rather than second degree murder, ' "[t]he intent to kill must be ... formed upon a pre-existing reflection," ... [and have] been the subject of actual deliberation or forethought ....' [Citation.] We have therefore held that '[a] verdict of murder in the first degree ... [on a theory of a wilful, deliberate, and premeditated killing] is proper only if the slayer killed "as a result of careful thought and weighing of considerations; as a deliberate judgment or plan; carried out coolly and steadily, [especially] according to a preconceived design." [Citation.]' [Citation.] [¶] The type of evidence which this court has found sufficient to sustain a finding of premeditation and deliberation falls into three basic categories: (1) facts about how and what defendant did prior to the actual killing which show that the defendant was engaged in activity directed toward, and explicable as intended to result in, the killing-what may be characterized as 'planning' activity; (2) facts about the defendant's prior relationship and/or conduct with the victim from which the jury could reasonably infer a 'motive' to kill the victim, which inference of motive, together with facts of type (1) or (3), would in turn support an inference that the killing was the result of 'a pre-existing reflection' and 'careful thought and weighing of considerations' rather than 'mere unconsidered or rash impulse hastily executed' [citation]; (3) facts about the nature of the killing from which the jury could infer that the manner of killing was so particular and exacting that the defendant must have intentionally killed according to a 'preconceived design' to take his victim's life in a particular way for a 'reason' which the jury can reasonably infer from facts of type (1) or (2).[¶] Analysis of the cases will show that this court sustains verdicts of first degree murder typically when there is evidence of all three types and otherwise requires at least extremely strong evidence of (1) or evidence of (2) in conjunction with either (1) or (3)." (*Id.* at ¶. 26-27.) Subsequent Supreme Court authority has explained that "these guidelines 'were formulated as a synthesis of prior case law, and are not a definitive statement of the prerequisites for proving premeditation and deliberation in every case.' " ( *People v. Welch* (1999) 20 Cal.4th 701, 758.)

Here, there is ample evidence of types (1) and (2), planning activity and motive, to support the verdict. First, there is no dispute that the motive for the attack was revenge for the victim having "snitched" on a fellow gang member. Tejada had told the police that LaFontaine had committed a drive-by shooting, and LaFontaine was in jail pending trial on the charge. There was evidence that LaFontaine had contacted gang members from jail and asked them to remove Tejada from the gang, and that LaFontaine's brother had made hand signals at Tejada simulating a gun. Hernandez testified that he had heard that Tejada had snitched from members of the DCL prior to the night of the attack. The jury could reasonably infer that because Ruiz was involved in the discussions about Tejada's fate on the night of the attack, he was aware of LaFontaine's request and of the reason for the prior threats to Tejada.

7

1    There is also substantial evidence that Ruiz participated in planning the
killing on the night of the attack. On his way to the school that evening, Ruiz
2    was asked what they were going to do about Tejada. Ruiz replied, "Don't worry
about it. We'll handle it tonight." Later that night, as the gang members
3    assembled at the school, Ruiz stood talking with his accomplices. Ruiz told the
group that "something should be done about [Tejada]." Although one gang
4    member said that Tejada should be jumped out of the gang, and another
suggested that Tejada should fight one-on-one with a man who wanted to join
5    the gang, Ruiz indicated that "he wasn't going to buy that plan." Ruiz said they
would follow a different plan under which the new guy would stop Tejada and
6    challenge him, and then he and the other gang members would jump in. Just
prior to the attack, a gang member told a number of friends who had gathered at
7    the park to leave because "something was going to happen to [Tejada], and that
he didn't want us to be there when it happened."

    Finally, the use of deadly weapons during the attack and the severity of
the wounds inflicted permit a reasonable inference that Ruiz and his accomplices
intended more than merely to jump Tejada out of the gang. (See *People v. Miller*
(1990) 50 Cal.3d 954, 993 [possession of a deadly weapon used on an unarmed
victim is strong circumstantial evidence of plan to kill]; *People v. Memro* (1995)
11 Cal.4th 786, 863-864 [method of killing can support finding that murder was
premeditated].) As asserted repeatedly by Ruiz, these were experienced gang
members who had participated in jump-outs before and knew what to expect.
There was testimony that gang members do not use weapons against fellow
members during a jump out. If they used weapons in the attack on Tejada, the
jury could reasonably infer that they did so because they planned to kill him
rather than, as Ruiz suggested, that some of his accomplices became more
violent than he had anticipated. The severity of the beating, including more than
44 stab wounds to Tejada's neck and head, is also consistent with such an
inference. Accordingly, substantial evidence supports the jury's finding that Ruiz
premeditated Tejada's killing.[2]

(Exh. E at 6-9) (footnote in original).

The state court's rejection of petitioner's challenge was not contrary to or an unreasonable application of federal law under federal law and *Jackson*. In reviewing the trial record, the California Court of Appeal found ample evidence supporting a finding of premeditation and deliberation (*id.* at 7-9). First, there is substantial evidence that Petitioner helped plan the killing. When asked on the day of the killing what they were going to do about the victim, petitioner responded, "Don't worry about it. We'll handle it tonight" (*id.* at 8). Additionally, on the night of the killing petitioner disagreed with one gang member's suggestion that the victim fight a man who wanted to join the gang, stating that "he wasn't

---

[2] Because we conclude that there is substantial evidence of Ruiz's premeditation and deliberation, we need not consider whether there was sufficient evidence to convict Ruiz under the alternative theories of murder by torture or of vicarious liability for the premeditation and deliberation of his accomplices.

going to buy that plan" (*ibid.*). Instead, petitioner suggested that the prospective gang member challenge the victim to fight, and petitioner and the other gang members would join in the fight (*ibid.*).

Petitioner's conversations with gang members on the night of the attack also show that his motive for the attack was revenge. Petitioner discussed the attack with gang members who were aware that the victim had "snitched" on a fellow gang member (*id.* at 7-8). A jury could reasonably infer that petitioner was aware of the victim's actions and that the killing was motivated by revenge. Finally, the severity of the attack and the use of deadly weapons suggests that petitioner killed in a particular and exacting manner. The victim was found with over 44 stab wounds to the neck and head (*id.* at 9).

The California Court of Appeal also correctly noted that there was little evidence countering the inference that petitioner killed deliberately and according to a preconceived design (*ibid.*). Even assuming, as petitioner argues, there exists evidence that would allow the jury to make conflicting inferences regarding petitioner's role in the attack, when viewed in the light most favorable to the prosecution, a rational jury could certainly have found beyond a reasonable doubt that petitioner acted deliberately and according to a preconceived design. Consequently, the state court's rejection of petitioner's claim was neither contrary to nor an unreasonable application of federal law, and petitioner is not entitled to federal habeas relief on his first claim.

### 2. VOLUNTARY MANSLAUGHTER INSTRUCTION

Petitioner next claims that he was prejudiced and his constitutional rights violated by the trial court's refusal to instruct the jury on the lesser included offense of voluntary manslaughter. Due process does not require that an instruction be given unless the evidence supports it. *Hopper v. Evans*, 456 U.S. 605, 611 (1982). While the failure to instruct on a lesser included offense in a capital case is constitutional error if there was evidence to support the instruction, *Beck v. Alabama*, 447 U.S. 625, 638 (1980), a state trial court's failure to instruct on a lesser included offense in a non-capital case does not present a federal constitutional claim, *Solis v. Garcia*, 219 F.3d 922, 929 (9th Cir. 2000). Although under *Solis* "the defendant's right to

9

1 adequate jury instructions on his or her theory of the case might, in some cases, constitute an
2 exception to the general rule," *ibid.* (citing *Bashor v. Riley*, 730 F.2d at 1240), *Solis* also
3 suggests that there must be substantial evidence to warrant the instruction on the lesser included
4 offense, *see id.* at 929-30 (no duty to instruct on voluntary manslaughter as lesser included
5 offense to murder because evidence presented at trial precluded a heat of passion or imperfect
6 self-defense instruction; no duty to instruct on involuntary manslaughter because evidence
7 presented at trial implied malice).

The state court denied petitioner's challenge and denied relief on the grounds that an instruction on voluntary manslaughter was not supported by the evidence. The California Court of Appeal analyzed the issue as follows:

> Ruiz contends that the jury should have been instructed on voluntary manslaughter because there was evidence from which the jury reasonably could have inferred that Tejada was killed because the gang members were "provoked by [his] show of disloyalty, and his appearance at the park as if nothing had happened." The trial court refused to give the requested instruction, stating, "I understand the defense argument that in this case, the-in a sense would argue that the source of the provocation was the act of the victim himself, in that he was thought to have and apparently did give information to the police regarding criminal activities of a fellow gang member. [¶] But ... all the evidence in this case indicates that there was such a considerable lapse in time between when the victim gave that information to the police and when the Daly City Locos found out about it, that as a matter of law, I would say that any passion being felt by the defendants was based on those prior activities, was really a desire for revenge. That the time lapse was so substantial, that you could not say it was either a sudden quarrel or the heat of passion under circumstances where there was not an adequate cooling time."
>
> Ruiz's argument that the gang members were provoked by Tejada's show of disloyalty is essentially an acknowledgment that the motive for the attack was revenge. To constitute voluntary manslaughter, however, the killing must occur "suddenly as a response to the provocation, and not belatedly as revenge or punishment." ( *People v. Daniels* (1991) 52 Cal.3d 815, 868.) The gang members did not learn just prior to the attack that Tejada had talked to the police about the January shooting. Rather, the evidence showed that gang members threatened Tejada almost a month before the event, and that Ruiz was planning the attack earlier in the day when he said that they would take care of Tejada that night. The attack did not occur unexpectedly as Tejada appeared at the park, but after Ruiz had discussed various plans with fellow gang members and warned others to leave the park. On this record, a jury could not reasonably find that the attack was suddenly provoked by Tejada's appearance at the park that night. The only reasonable interpretation of the evidence is that the DCL gang members planned to attack Tejada that night as punishment for talking to the police.

(Exh. E at 10-11).

10

The state court correctly denied petitioner's claim that the trial court erred in refusing to instruct the jury on voluntary manslaughter. Petitioner argues that there is evidence from which the jury could have inferred that he was provoked by the victim's disloyalty and appearance at the park on the night of the crime (*id.* at 10). However, there is no evidence in the record to support petitioner's claim that he acted out of passion. Rather, as the California Court of Appeal noted, petitioner's argument that he was provoked by the victim's disloyalty supports the conclusion that any passion he felt was actually a desire for revenge (*ibid.*). Furthermore, the evidence shows that there was a substantial lapse of time between when petitioner learned of the victim's disloyalty and the attack, as well as between when the victim appeared at the park and the attack (*id.* at 10-11). Because there was not substantial evidence that petitioner committed the lesser included offense of voluntary manslaughter, the state court's rejection of petitioner's claim was neither contrary to nor an unreasonable application of federal law, and petitioner is not entitled to habeas relief on his second claim.

3. **INSTRUCTIONS ON LESSER-RELATED OFFENSES**

Petitioner argues that the trial court's failure to give instructions on the lesser-related offenses of simple battery, simple assault, battery with serious bodily injury, assault with a deadly weapon, and assault with force likely to produce great bodily injury violated petitioner's constitutional right to present a defense. Due process requires that "'criminal defendants be afforded a meaningful opportunity to present a complete defense.'" *Clark v. Brown*, 450 F.3d 898, 904 (9th Cir. 2006) (quoting *California v. Trombetta*, 467 U.S. 479, 485 (1984)). Therefore, a criminal defendant is entitled to adequate instructions on his defense theory of the case. *See Conde v. Henry*, 198 F.3d 734, 739 (9th Cir. 2000) (error to deny defendant's request for instruction on simple kidnaping where such instruction was supported by the evidence). However, a defendant is entitled to an instruction on his defense theory only "if the theory is legally cognizable and there is evidence upon which the jury could rationally find for the defendant." *United States v. Boulware*, 558 F.3d 971, 974 (9th Cir. 2009) (internal quotations omitted).

The California Court of Appeal rejected petitioner's claim that he was denied an

11

1  opportunity to present a complete defense based on the following analysis:

> In rejecting the proposed instructions, the trial court relied on *People v. Birks* (1998) 19 Cal.4th 108, 136, in which our Supreme Court held that a trial court cannot instruct on lesser related offenses without the prosecutor's permission. Permitting the court to instruct on lesser related offenses over the objection of the prosecutor, the court ruled, would interfere with the prosecutor's "sole discretion to determine whom to charge with public offenses and what charges to bring." (*Id.* at ¶. 134-136.)
>
> Despite this clear authority, Ruiz argues that the trial court should have instructed on the lesser related crimes because in this case they constituted a defense, and the failure to instruct therefore impinged on his federal constitutional rights to due process, compulsory process and fair trial by jury. Ruiz confuses his theory of the case with an affirmative defense. Assault and battery are offenses that may be charged by the prosecutor, but they are not defenses to murder. If the jury had accepted Ruiz's theory of the case, that he had not intended to kill Tejada, under the instructions that the court gave he would have been entitled to an acquittal of the charged crimes. He had no right to have the jury given the option of convicting him of a lesser crime not charged by the prosecutor and not necessarily included in the offenses charged. (*People v. Birks*, *supra*, 19 Cal.4th at p. 136.) Accordingly, defendant was not denied his constitutional right to present a defense.

(Exh. E at 11-12).

The state court correctly held that the trial court's refusal to give the requested instructions on lesser-related offenses did not deny petitioner the opportunity to present a complete defense based on his theory of the case. The instructions given did not prevent petitioner from arguing as a defense to his first-degree murder charge that his role in the attack was limited to the commission of lesser-related offenses, nor did the instructions inhibit the jury from accepting petitioner's theory of the case. As the California Court of Appeal noted, had the jury accepted petitioner's defense theory, petitioner would have been eligible for acquittal of his first-degree murder charge (*id.* at 12). However, petitioner has no constitutional right to have the jury instructed on lesser offenses not charged by the state. *See Hopkins v. Reeves*, 524 U.S. 88, 88 (1998) (state trial courts are not required to instruct juries on offenses that are not lesser included offenses of the charged crime under state law). Because the instructions did not deny petitioner the opportunity to present his defense theory of the case, the state court's rejection of petitioner's claim was neither contrary to nor an unreasonable application of federal law, and petitioner is not entitled to habeas relief on his third claim.

12

### 4. INSTRUCTIONS ON AIDING AND ABETTING AND THE NATURAL CONSEQUENCES DOCTRINE

Petitioner argues that the instructions given by the trial court on aiding and abetting and the natural and probable consequences doctrine were misleading in that they failed to inform the jury that petitioner could be found culpable as an aider and abettor of a lesser offense than the offense committed by the actual perpetrator.  In order to establish a due process violation, petitioner must show both ambiguity in the instructions and a "reasonable likelihood" that the jury applied the instruction in a way that violates the Constitution, such as relieving the state of its burden of proving every element beyond a reasonable doubt. *Waddington v. Sarausad*, 129 S. Ct. 823, 831 (2009) (internal quotations and citations omitted).  In reviewing an ambiguous instruction, the inquiry is not how reasonable jurors could or would have understood the instruction as a whole, but rather whether there is a "reasonable likelihood" that the jury has applied the challenged instruction in a way that violates the Constitution. *Estelle v. McGuire*, 502 U.S. at 72 & n.4.

The California Court of Appeal denied petitioner's claim that the jury instructions on aiding and abetting and the natural and probable consequences doctrine were misleading, as follows:

> Ruiz contends that the instructions failed to inform the jury that he could be convicted as an aider and abettor of a lesser crime than the crime committed by the actual perpetrator. He argues that by instructing the jury that the aider and abettor was "equally guilty" as the perpetrator, the court misled the jury to believe that it could not convict Ruiz of involuntary manslaughter if it found that the perpetrator committed first degree murder. We disagree.
>
> The instructions given by the court were not misleading. The jury was instructed that an aider and abettor is regarded as a principal in the crime committed by the perpetrator and is "equally guilty" regardless of the extent or manner of his participation. (CALJIC No. 3.00.) [] The court also informed the jury that one aids and abets in the commission of a crime when by act or advice one aids, promotes, encourages or instigates the commission of a crime with knowledge of the unlawful purpose of the perpetrator and with the intent to encourage or facilitate the crime. (CALJIC No. 3.01.) [] Finally, the jury was instructed that an aider and abettor is guilty not only of the crime he knows the perpetrator contemplates, but also of any crime that is the natural and probable consequences of any criminal act he knowingly and intentionally aided and abetted. ( CALJIC No 3.02.) [] In this instruction, the court identified aggravated assault and battery as the potential target crimes that Ruiz and his accomplices may originally have contemplated. Accordingly, based on these instructions, the jury was asked to determine whether Ruiz aided and abetted in the commission

13

of an assault or battery and, if so, whether involuntary manslaughter, second degree or first degree murder resulted as a natural and probable consequence of the assault or battery.

Contrary to Ruiz's assertion, under these instructions the jury could have found that Ruiz aided and abetted in only a battery and that, because he had no knowledge of his accomplices' intent to use such extreme violence or to kill Tejada, involuntary manslaughter was the only reasonably foreseeable consequence of the battery. By informing the jury in CALJIC No. 3.00 that one who aids and abets a crime is equally as guilty as the perpetrator of that crime, the court did not imply that one who aids and abets one crime is equally as guilty as the perpetrator may be of another crime. If the jury found that Ruiz aided and abetted in the murder of Tejada, he would be just as guilty as the person who actually inflicted the deadly blow. However, if the jury found that Ruiz aided and abetted in only an assault or battery, Ruiz would be as guilty as the perpetrator of the assault or battery and of any other crime which the jury found to be the natural and probable consequence of the assault or battery. (CALJIC No. 3.02.) The natural and probable consequences doctrine provided an alternative theory under which Ruiz might have been found guilty of murder or manslaughter, but nothing in the instructions suggests that liability imposed under this theory must be the same for everyone who participated in the attack on Tejada. To the contrary, CALJIC No. 3.02 stated that the natural and probable consequences for which one is responsible is to be determined by what, "under all of the circumstances surrounding the incident," one should have "reasonably expected to occur if nothing unusual has intervened." What is a reasonably foreseeable consequence "depend[s] on the circumstances surrounding the conduct of both the perpetrator and the aider and abettor" and requires individualized consideration by the jury for each participant. ( *People v. Woods* (1992) 8 Cal.App.4th 1570, 1587 ( *Woods* ).)

Although Ruiz suggests that *Woods* requires the reversal of his conviction, the decision actually supports the opposite conclusion. In *Woods*, the court concluded that a defendant who aids and abets in the commission of one crime can be convicted of a lesser crime than the perpetrator. (8 Cal.App.4th at ¶. 1577-1578.) "The fact the perpetrator cannot be found guilty of both a greater and a necessarily included offense [citations] should not preclude an aider and abettor from being found guilty of an uncharged, necessarily included offense when the lesser, but not greater, offense is a reasonably foreseeable consequence of the crime originally aided and abetted." (*Id.* at ¶. 1587-1588.) In *Woods*, the court did not find any fault with the CALJIC instructions on aiding and abetting, which were the same as those given in this case, but reversed the conviction because the trial judge had answered "no" when the jury asked whether the defendant could be found guilty of aiding and abetting a murder in the second degree if the actual perpetrator of the same murder were determined to be guilty of murder in the first degree. (*Id.* at ¶. 1577-1579.) The Court of Appeal also held that "If the evidence raises a question whether the offense charged against the aider and abettor is a reasonably foreseeable consequence of the criminal act originally aided and abetted but would support a finding that a necessarily included offense committed by the perpetrator was such a consequence, the trial court has a duty to instruct sua sponte on the necessarily included offense as part of the jury instructions on aider and abettor liability." (*Id.* at p. 1593.) Here, the instructions did instruct on every offense that is necessarily included in the charge of first degree murder.

Thus, properly understood the instructions given in this case did correctly

14

> advise the jury it might find Ruiz guilty of a lesser offense such as involuntary manslaughter even if one whom Ruiz aided and abetted in committing the attack was guilty of a more serious offense such as murder in the first degree. It may be that the instructions could have been clearer on this point, but none of the defendants requested a clarifying instruction, and the trial court was under no sua sponte obligation to give such a pinpoint instruction. (*People v. Talamantes* (1992) 11 Cal.App.4th 968, 974-975.) At trial, Ruiz objected only to the inclusion of CALJIC No. 3.02 and, as indicated above, that instruction was perfectly appropriate. Moreover, there is no reason to believe the jury was confused on this issue. Ruiz's attorney stressed the point during closing argument, and neither the judge nor the prosecutor said anything to suggest that the law was otherwise or that both defendants necessarily had to be guilty of the same offense. Indeed, the verdicts reflect that the jury understood this fully, since the jury found Reyes guilty of only second degree murder while convicting Ruiz of murder in the first degree.

(Exh. E at 12-16) (footnotes omitted).

The state court's conclusion that the instructions given were unambiguous and properly applied by the jury does not violate federal law or *McGuire*. The California Court of Appeal correctly found that under the instructions given the jury could have determined that petitioner aided and abetted an aggravated assault or battery, the natural and probable consequence of which was only involuntary manslaughter and not murder (*id.* at 14). Petitioner's argument that the jury misunderstood the "equally guilty" clause in CALJIC No. 3.00 to preclude convicting him of a different offense than that committed by the actual perpetrator is belied by the jury's verdict finding petitioner guilty of first-degree murder and his co-defendant guilty of only second-degree murder (*id.* at 12).

Finally, any error in the instructions on aiding and abetting did not prejudice petitioner because, for the reasons discussed above, there was ample evidence that petitioner committed first-degree murder under the alternative theory of premeditation and deliberation. Any error in the jury instructions on aiding and abetting, therefore, did not have a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (internal quotation and citation omitted).

Because there is no reasonable likelihood the jury misapplied the aiding and abetting instructions in a manner that violates the Constitution, the state court's denial of petitioner's claim was neither contrary to nor an unreasonable application of federal law, and petitioner is not entitled to habeas relief on his fourth claim.

15

**CONCLUSION**

The petition for a writ of habeas corpus is **DENIED**.

Rule 11(a) of the Rules Governing Section 2254 Cases now requires a district court to rule on whether a petitioner is entitled to a certificate of appealability in the same order in which the petition is denied. Petitioner has failed to make a substantial showing that his claims amounted to a denial of his constitutional rights or demonstrate that a reasonable jurist would find this court's denial of his claim debatable or wrong. *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Consequently, no certificate of appealability is warranted in this case.

The clerk shall close the file.

**IT IS SO ORDERED.**

Dated: February  11  , 2010.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

G:\PRO-SE\WHA\HC.05\RUIZ636.RUL.wpd